UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
SUZANNE M. PEMRICK,

     Plaintiff,

  - against -

ALFRED STRACHER, et al.,

     Defendants.
--------------------------------------------------X

**MEMORANDUM
AND ORDER**

92 CV 959 (CLP)

  By notice of motion dated June 12, 2006, defendants State University of New York

("SUNY")[1] and the Research Foundation of the State University of New York ("Research

Foundation") move for summary judgment on the state law claims of conversion and replevin

brought by plaintiff Suzanne Marie Pemrick, Ph.D., proceeding pro se.

  For the foregoing reasons, this Court grants defendants' motion for summary judgment.


FACTUAL AND PROCEDURAL BACKGROUND

A.  Factual Background

  The underlying facts are set forth in this Court's earlier Memoranda and Orders dated

January 13, 2005 and November 4, 2005. For purposes of the current motion, there is no dispute

that plaintiff was employed by SUNY from 1978 to 1988, as an Assistant Professor (non-tenure

_____

  [1]Plaintiff separately names both SUNY and SUNY's Health Science Center at Brooklyn,
also known as "SUNY Downstate," and "SUNY Brooklyn." However, SUNY Downstate and
SUNY Brooklyn lack a separate legal existence from SUNY, see New York Education Law §
352(1), (3), and this Court accordingly refers to SUNY, SUNY Downstate, and SUNY Brooklyn
as "SUNY."

track) in the Biochemistry Department.  (See EEOC Compl. # 1).[2]  With the support of the

Research Foundation, Dr. Pemrick received research grants from the National Institute of Health

("NIH") and the Muscular Dystrophy Association ("MDA").

According to defendant Research Foundation, in 1978, the NIH awarded a grant to the

Research Foundation on behalf of SUNY, listing Dr. Pemrick as the "Principal

Investigator/Program Director/Awardee."  (Defs.' 56.1 Stmnt.[3] ¶ 5).  Under the NIH research

grant, the Research Foundation was reimbursed by the federal government for allowable research

and equipment costs through a letter of credit that was limited to the amount of the grant

awarded.  (Id. ¶ 7).  As principal investigator, Dr. Pemrick placed an order to purchase the

appropriate equipment and then submitted the purchase order to the Research Foundation, which

dispersed the necessary funds from the grant account.  (Id. at 6).  In March of 1986, Dr. Pemrick

learned that her grant would not continue to be funded by the NIH.  (Defs.' 56.1 Stmnt. ¶ 12).

---

[2] Citations to "EEOC Compl. # 1" refer to the first EEOC complaint filed by Dr. Pemrick on February 9, 1989, which was attached as an exhibit to the First Amended Complaint ("First Am. Compl.") at page 8.  Citations to "EEOC Compl. # 2" refer to Dr. Pemrick's second EEOC complaint filed on February 9, 1989, which was attached as an exhibit to the First Amended Complaint at page 11.

[3] Citations to "Defs.' 56.1 Stmnt." refer to the Research Foundation's Statement of Material Facts Pursuant to Local Rule as to Which There is no Material Dispute, submitted on June 12, 2006.  Plaintiff has not filed a counter Rule 56.1 Statement.  While the Court may therefore deem the facts stated in defendants' Rule 56.1 Statement admitted, see Local Rule 56.1(c); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001), the Court has only relied upon those material facts that the pro se plaintiff has not disputed in either of her two memoranda of law submitted in connection with this motion, or which are established as undisputed through this Court's review of the record.  See Holtz v. Rockefeller & Co., Inc., 258 F.3d at 73 (holding that a district court "may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file [a Rule 56.1] statement") (quoting Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 292 (2d Cir.), cert. denied, 531 U.S. 1035 (2000)).

Upon learning that her grant had expired, plaintiff requested that SUNY continue to fund her salary and that of her assistant for a one-year period. (Defs.' 56.1 Stmnt. ¶ 13). In response, Dr. Richard Schwarz, Dean of SUNY Downstate, granted plaintiff's request and, using emergency funding, extended plaintiff's and her assistant's salaries pending renewal of the NIH grant. (Defs.' 56.1 Stmnt. ¶ 13). A second extension was granted, giving Dr. Pemrick an additional five months of salary, with the extension to expire March 31, 1987. (Id.) Thereafter, in the spring of 1987, plaintiff was informed that her appointment as an Assistant Professor of Biochemistry and Biophysics at SUNY had been terminated. (First Am. Compl.[4] at 14). Nevertheless, when Dr. Pemrick's renewed grant application was denied, SUNY supported another extension, first until the end of the academic year, June 30, 1987, and then a no-cost time extension was granted through September 9, 1987. (Id. ¶ 14 (citing Aff.[5] ¶ 16)).

On September 11, 1987, plaintiff and SUNY entered into an agreement ("Agreement") that provided for SUNY to offer plaintiff research salary support at the level of Assistant Professor retroactive to March 31, 1987 through August 31, 1988. (See id. ¶ 15 (citing Aff. ¶ 17); see also Aff., Ex. 15). The Agreement provided that if the NIH grant was activated during this period, SUNY would accept the grant through March 31, 1989. (See id. ¶ 15 (citing Aff. ¶ 17); see also Aff., Ex. 15). Under the Agreement, plaintiff's resignation became effective as of August 31, 1988, but until then plaintiff was to have unlimited access to her laboratory. (Id. ¶ 15). By letter dated August 31, 1988, SUNY Downstate's Associate Vice President for

---

[4]Citations to "First Am. Compl." refer to the First Amended Complaint, filed on or about March 8, 1991.

[5]Citations to "Aff." refer to the Joint Affirmation in Support of Defendants' Motions for Summary Judgment, dated June 12, 2006.

Academic Administration, Mr. John F. O'Connor, informed Dr. Pemrick that the room where the equipment was to be stored would be secured and asked her to notify SUNY when she obtained another position. (Aff. ¶ 18, Ex. 16).

Plaintiff alleges that on or about October 1, 1988, while her NIH project was still actively under competitive review, and while officials at SUNY waited to learn whether plaintiff would obtain a new position where she could use the equipment, SUNY and the Research Foundation dismantled the laboratory; all items were removed, and the equipment was inventoried, packed and placed in temporary storage at the Research Foundation pursuant to HHS guidelines. (See id. ¶ 16; Third Am. Compl.[6] ¶¶ 29, 31). Despite repeated requests that SUNY and the Research Foundation provide her with an accurate inventory of the equipment, her requests were refused. (Third Am. Compl. ¶ 30). Plaintiff claims that, without her permission, defendants abused, damaged, lost, misplaced, misappropriated and/or deliberately re-distributed the laboratory equipment within 30 days of storing the equipment. (Id. ¶¶ 31, 33).

On November 15, 1989, Dr. Schwarz advised plaintiff by letter that it had been "over a year" since SUNY had agreed to store the equipment and he reminded her that under NIH policy, title to the equipment must be transferred after 120 days either to the grantee institution, to the NIH, or to a new institution. (Id. ¶ 20, Ex. 18). He further noted that because more than 120 days had passed, "full title to the equipment now rests with the Research Foundation." (Id.) Nevertheless, Dr. Schwarz gave plaintiff until January 31, 1990 to identify a new institution to which the equipment could be transferred. (Id.) Otherwise, he informed her that the equipment

---

[6]Citations to "Third. Am. Compl." refer to the Third Amended Complaint, dated April 5, 2000.

4

would be used by other researchers at SUNY Downstate. (Id.) He also indicated that the

Research Foundation would, in the meantime, continue to maintain the equipment in storage

until plaintiff provided notice as to the new institution she would be joining so that the

equipment could be shipped there.[7] (Id.)

On January 9, 1990, plaintiff met with Dr. Schwarz to discuss her efforts to get funding

for a new position. (Id. ¶ 21, Ex. 19). When Dr. Schwarz was advised by a grant officer that Dr.

Pemrick's renewal grant proposal had not been funded, plaintiff was informed by letter dated

April 16, 1990 that the equipment would be distributed effective May 1, 1990, once plaintiff

removed her personal items. (Id.) According to defendants, that date was later pushed back to

June 8, 1990, in the event that she was able to secure an appointment at an educational institution

by that time. (Id. ¶ 22, Ex. 20). Although plaintiff notified the Research Foundation on several

occasions that she was negotiating for a position at another institution and the Foundation held

the equipment for more than two years, Dr. Pemrick never requested transfer of the equipment.

(See Defs.' 56.1 Stmnt. ¶¶ 17-18). Indeed, the Research Foundation notes that plaintiff never

made a request for the return of the equipment as required by New York law, nor does she want

the equipment returned to her.[8] (Defs.' 56.1 Stmnt. (citing Pemrick Dep. at 45-46, 55-56, 68, 71,

74, 75, 87, 88, 89, 90, 91)).

Plaintiff seeks damages from the Research Foundation and SUNY, claiming that her

_____

[7]Plaintiff claims that by this time, the equipment had already been dispersed. (See Compl. ¶¶ 30-33).

[8]Plaintiff asserts that it is irrelevant that she never asked for a transfer of the equipment to a new institution because the claims for conversion and replevin date back to February 1989 when the equipment began to disappear or was transferred to other faculty members. (Pl.'s Mem. at 14).

grant renewal application, her research project, and her ability to relocate to another scientific institution were damaged by the defendants' improper handling of the equipment.  (See Pl.'s Reply Mem.[9] at 6-7; Pl.'s Mem. at 17).[10]


B.  Procedural Background

On or about July 1, 1990, plaintiff, proceeding pro se, commenced this action in the Northern District of New York against defendants Alfred Stracher, who was Chair of the Department of Biochemistry at SUNY, and Richard Schwarz, who was Dean of SUNY Downstate, alleging that she was denied a tenure track position as an Assistant Professor due to age discrimination.[11]  Although plaintiff's pro se narrative in the initial Complaint detailed the acts of discrimination for which each defendant was allegedly responsible, the Complaint made no reference to the laboratory equipment, nor did it specify either of the defendant's roles in the alleged loss and destruction of that equipment.

---

[9]Citations to "Pl.'s Reply Mem." refer to Plaintiff's Memorandum of Law-2 In Opposition to Defendants' Motion in Support for Summary Judgment, dated October 17, 2006.

[10] See infra at 31 n.26.

[11] On February 9, 1989, plaintiff filed two complaints with the Equal Employment Opportunity Commission ("EEOC"), claiming employment discrimination by her employer, SUNY.  (EEOC Compl. # 1; EEOC Compl. # 2). In one of the two EEOC complaints, plaintiff alleged that her position was ultimately filled by a younger candidate and that she was the victim of age discrimination.  (EEOC Compl. # 1; see also First Am. Compl. at 13).  In the other EEOC complaint, plaintiff alleged that the position was filled by a male and that she was the subject of sex discrimination and retaliation for her role as a women's advocate.  (EEOC Compl. # 2; see also First Am. Compl. at 13).  The EEOC ultimately determined that there was no reasonable cause to find a violation and issued a right to sue letter to plaintiff for each complaint.  (EEOC Determination, May 4, 1990, attached as exhibit to Third Amended Complaint at pages 10–11; EEOC Determination, November 23, 1990, attached as exhibit to Third Amended Complaint at page 13).

On or about March 8, 1991, plaintiff filed her First Amended Complaint, which named SUNY and SUNY Brooklyn as additional defendants, and included an additional charge of sex discrimination. No references to the laboratory equipment were added to the Complaint at that time.

The case was transferred to the Eastern District of New York on or about March 2, 1992, and defendants moved for summary judgment following the completion of discovery. That motion was granted to the extent that plaintiff's claims against the individual defendants were dismissed with prejudice, but Dr. Pemrick was permitted to pursue her claims of discrimination against her employer. See Pemrick v. Stracher, 67 F. Supp. 2d 149, 169-70 (E.D.N.Y. 1999).

Thereafter, Dr. Pemrick obtained counsel in December 1999 and filed a Second Amended Complaint on or about March 13, 2000 ("Second Am. Compl."), in which she added new state law claims for conversion, replevin, and age discrimination, pursuant to New York Executive Law § 295. (Second Am. Compl. ¶¶ 32-36). On or about April 7, 2000, plaintiff filed a Third Amended Complaint ("Third Am. Compl."), adding the Research Foundation as a defendant.[12] (Third Am. Compl. ¶¶ 32–38). In this Third Amended Complaint, plaintiff asserted that SUNY and the Research Foundation were responsible for the illegal conversion of her laboratory equipment. (Id. ¶¶ 32-33). There were no allegations in the Third Amended Complaint naming the individual defendants in the conversion claims, or alleging that either Dr. Schwarz or Dr. Stracher were individually responsible for the loss of the equipment.

Beginning on April 24, 2000, a seven-day bench trial was held before the Honorable

---

[12] In response to the Third Amended Complaint, SUNY and the Research Foundation filed Answers on or about April 17, 2000 and November 22, 2000, respectively.

Joanna Seybert. Since the Research Foundation was named as a defendant only in the claims for conversion and replevin (see Third Am. Comp. at 1), those claims were severed from the other claims and accordingly were not addressed during the trial before Judge Seybert. (See Jan. Order[13] at 6).

On September 24, 2002, Judge Seybert entered judgment in favor of defendant SUNY with respect to Dr. Pemrick's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) et seq., and the New York State Human Rights Law. (See Sept. Mem. & Order;[14] see also Order of Nov. 20, 2002 (clarifying that the judgment entered only applied to certain of plaintiff's claims)). On March 7, 2003, the parties consented to have the case referred to the undersigned for the purpose of resolving plaintiff's remaining claims.

On July 30, 2003, Dr. Pemrick, proceeding pro se, submitted a proposed Fourth Amended Complaint, which contained federal claims under 45 C.F.R. § 80 (effectuating Title VI of the Civil Rights Act of 1964) and 45 C.F.R. § 74.34 (governing title to equipment). In her proposed Fourth Amended Complaint, Dr. Pemrick alleged that the defendants seized, misused, abused and lost certain laboratory equipment and materials, valued at $300,000.00, which Dr. Pemrick purchased with funds from research grants awarded to her by the NIH and MDA. (See Fourth Am. Compl. ¶¶ 24, 29, 31). On September 10, 2003, plaintiff sought to amend the complaint to add state law claims of conversion and replevin against John Allen, Peter French, Alfred Stracher, and Richard Schwarz, who were employed during the time in question by SUNY and/or the Research Foundation. Thereafter, on November 10, 2003, plaintiff submitted a

_____

[13]Citations to "Jan. Order" refer to this Court's Order dated January 13, 2005.

[14]Citations to "Sept. Mem. & Order" refer to Judge Seybert's Memorandum & Order dated September 5, 2002.

Revised Fourth Amended Complaint, in which she voluntarily withdrew the claim under 45 C.F.R. § 80.  (Compare Fourth Am. Compl. ¶¶ 46–47 with Revised Fourth Am. Compl. ¶¶ 46–47).  On January 13, 2005, this Court issued an Order denying plaintiff's motion to amend to add claims under 45 C.F.R. § 74.34 on the grounds of futility.  (See Jan. Order at 16).  By Memorandum and Order dated November 4, 2005, this Court denied plaintiff's request to add claims against the individuals because of plaintiff's insufficient explanation for her delay in naming these individuals for many years, and the undue prejudice that the proposed defendants would suffer.[15]  (See Nov. Order at 20-21).

Accordingly, plaintiff's Third Amended Complaint against SUNY and the Research Foundation for state law claims of conversion and replevin is all that remains of the above captioned case.

## DISCUSSION

A.  Supplemental Jurisdiction

Although the parties have not raised the matter of supplemental jurisdiction over the pending claims, courts have the duty to determine sua sponte whether subject matter jurisdiction

---

[15]Plaintiff asserts in her Memorandum of Law that based on "her mistake," the Court's November Order improperly struck Dr. Stracher and Dr. Schwarz from the Complaint, because their names appeared in the caption of the Second and Third Amended Complaints.  (Pl.'s Mem. at 6 n.1).  However, the claims against Dr. Stracher and Dr. Schwarz had already been dismissed against these individuals by the district court's summary judgment order in 1999, well before the plaintiff's Second and Third Amended Complaints were filed in 2000.  See Pemrick v. Stracher, 67 F. Supp. 2d at 169-70; see also Sept. Mem. & Order at 3 (noting that the district court had "dismissed the claims against individual defendants Drs. Stracher and Schwartz [sic]")).  The Court thoroughly considered all of the individuals that plaintiff sought to add to the complaint in the November Order, and denied plaintiff's request to add Dr. Stracher and Dr. Schwarz despite her similar arguments at that time.  (See Nov. Order at 17-21).

exists.  See Ametex Fabrics, Inc. v. Just in Materials, Inc., 140 F.3d 101, 105 (2d Cir. 1998)

(citing Saint John Marine Co. v. United States, 92 F.3d 39, 43 (2d Cir. 1996)).  State law claims

of conversion and replevin were initially added to this case at a time when federal claims were

still pending before the court, and thus the court exercised supplemental jurisdiction over the

state law claims as well.  However, after the trial held before the Honorable Joanna Seybert in

2000, judgment was entered in favor of defendants on all federal claims, and only the New York

State law claims of conversion and replevin now remain.  When "a federal court dismisses all

claims over which it had original jurisdiction, it must reassess its jurisdiction . . . ."  Motorola

Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004), cert. denied, 544 U.S. 1044 (2005).  The

statute governing supplemental jurisdiction provides that "district courts may decline to exercise

supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over

which it has original jurisdiction."  28 U.S.C. § 1367(c).  The decision to exercise supplemental

jurisdiction in these circumstances is in the discretion of the district court.  See First Capital

Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 182-83 (2d Cir. 2004).  However, courts are

guided by considerations of "judicial economy, convenience, and fairness to litigants."  Id. at

183.

The present case has been pending before the district court for more than a decade, and

has included numerous conferences, hearings, motions, and a trial.  Given these circumstances,

the Court finds that, in the interests of judicial economy and convenience, it would be

inappropriate to decline to exercise jurisdiction in this case.  See, e.g., Motorola Credit Corp. v.

Uzan, 388 F.3d at 56 (affirming district court's retention of jurisdiction where that court had

already expended significant judicial resources on the case prior to the dismissal of federal

claims); <u>Ametex Fabrics, Inc. v. Just In Materials, Inc.</u>, 140 F.3d at 105-06 (finding that a district court did not abuse its discretion when it maintained jurisdiction after discovery and a settlement conference had taken place); <u>Purgess v. Sharrock</u>, 33 F.3d 134, 138 (2d Cir. 1994) (holding that where the dismissal of the federal claim occurs late in the action, supplemental jurisdiction is properly exercised).  Additionally, fairness to the parties requires that the Court continue to exercise jurisdiction over the pending case because plaintiff would now be barred from filing claims of conversion and replevin in state court due to the expiration of the relevant three-year statute of limitations.  <u>See</u> N.Y. C.P.L.R. § 214(3).  Accordingly, the Court exercises supplemental jurisdiction over remaining state law claims.


B.  <u>SUNY's Eleventh Amendment Motion</u>

SUNY moves for summary judgment on plaintiff's remaining state law claims of replevin and conversion, arguing first that her claims are barred by the Eleventh Amendment.


1)  <u>Eleventh Amendment Immunity</u>

Under the Eleventh Amendment, federal courts are barred from entertaining claims under state law brought against a state, state agency or state department, unless the state has expressly consented to the suit.  <u>See</u> <u>Pennhurst State School & Hosp. v. Holderman</u>, 465 U.S. 89, 101 (1984); <u>Jungels v. State Univ. College of N.Y.</u>, 922 F. Supp. 779, 784 (W.D.N.Y. 1996), <u>aff'd</u> <u>sub nom</u>, <u>Jungels v. Jones</u>, 112 F.3d 504 (2d Cir. 1997).  SUNY is an agency of the State of New York and thus cannot be sued in federal court absent the State's consent.  <u>See</u> <u>Pennhurst State School & Hosp. v. Holderman</u>, 465 U.S. at 101; <u>Dube v. State Univ. of N.Y.</u>, 900 F.2d 587, 594-

95 (2d Cir. 1990) (holding that "[f]or Eleventh Amendment purposes, SUNY is an integral part of the government of the State of New York and when it is sued the State is the real party"), <u>cert. denied</u>, 501 U.S. 1211 (1991); <u>Ettinger v. SUNY College of Optometry</u>, No. 95 CV 9893, 1998 WL 91089, at *9 (S.D.N.Y. Mar. 2, 1998) (holding that "SUNY must be accorded Eleventh Amendment immunity as a matter of law"); <u>Jungels v. State Univ. College of N.Y.</u>, 922 F. Supp. at 784; <u>Cassells v. University Hosp. at Stony Brook</u>, 740 F. Supp. 143, 147 (E.D.N.Y. 1990). Since New York has not consented to be sued in federal court on state law claims such as conversion and replevin, the Eleventh Amendment bars plaintiff's claims against SUNY. <u>See, e.g.</u>, <u>Jacobs v. SUNY at Buffalo School of Medicine</u>, 204 F. Supp. 2d 586, 593 (W.D.N.Y. 2002) (noting that "the Eleventh Amendment generally prohibits suits against state governments in federal court"); <u>Ettinger v. SUNY College of Optometry</u>, 1998 WL 91089, at *8 (noting that a "federal court may not grant relief against state officials on the basis of state law violations"); <u>Cassells v. University Hosp. at Stony Brook</u>, 740 F. Supp. at 147 (holding that, absent waiver "the Eleventh Amendment bars citizens from enforcing pendent state law claims against their state in a federal court").

2) <u>Waiver of Immunity</u>

Plaintiff contends that SUNY waived its right to assert immunity under the Eleventh Amendment when it chose not to pursue its defense of Eleventh Amendment immunity as part of its trial strategy. (Pl.'s Mem. at 10-11.) In essence, plaintiff asserts that in 2000, SUNY attempted to settle with the plaintiff on the equipment claims. She contends that SUNY deliberately chose not to assert the defense of Eleventh Amendment immunity in 2000 so that

"they had a better chance of removing the equipment claim from consideration at trial of the discrimination claims (including retaliation) by settling the equipment issue. . . ." (Id. at 11). SUNY's actions are, in plaintiff's reckoning, akin to SUNY "stepping into" court when it benefitted it to do so, and now "stepping out" of court for when that inconsistent position serves it. (See id. at 25-27, citing People of Porto Rico v. Ramos, 232 U.S. 627, 631 (1914)).

Here, there is no evidence that the State of New York has made a "clear declaration" that it consented to suit in federal court on these conversion/replevin claims, see Pennhurst State School & Hosp. v. Stalderman, 465 at 99 n.9, nor has it voluntarily invoked the Court's jurisdiction. See College Savings Bank, 527 U.S. at 675-76; see also Gunter v. Atlantic Coast Line RR Co., 200 U.S. 273, 284 (1906). Moreover, although a state can expressly waive sovereign immunity, see College Savings Bank, 527 U.S. 666 (1999), the test for waiver is "a stringent one." Id. at 675 (citing Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985)). Provided that they have not waived their immunity, states are permitted to raise the issue of Eleventh Amendment immunity at any time. See Edelman v. Jordan, 415 U.S. 651, 677-78 (1974) (citing Ford Motor Co. v. Dep't of Treasury, 323 U.S. 459, 466-67 (1945)).

States may waive their right to Eleventh Amendment immunity through litigation conduct. See Lapides v. Bd. of Regents of the Univ. Sys., 535 U.S. 613, 620 (2002) (holding that where a State voluntarily agrees to remove a case to federal court, it voluntarily invokes that court's jurisdiction). Plaintiff relies on People of Porto Rico v. Ramos, 232 U.S. 627, for the assertion that SUNY has waived its Eleventh Amendment immunity by submitting to the January 2000 Order to inventory the missing equipment. (See Pl.'s Mem. at 24). In Ramos, however, the State had petitioned to become a party in the case. See id. at 631. Likewise, in Lapides, the

State itself had removed the case to a federal court, thereby voluntarily invoking federal jurisdiction. See Lapides v. Bd. of Regents of the Univ. Sys., 535 U.S. at 620. Unlike these cases, SUNY has never invoked federal jurisdiction as to plaintiff's state law claims. The fact that the State sought an order from the district court to allow it to search for the missing equipment in January 2000 does not constitute an invocation of jurisdiction as to the state law claims, nor is its conduct sufficient to indicate waiver. As defendants point out, "the dismantling of plaintiff's laboratory and loss of her equipment was not merely part of a state law claim; it was also part of what she claimed was a course of discriminatory conduct in her Title VII complaint." (Defs.' Reply Mem.[15] at 5).

Moreover, the fact that SUNY has not previously moved to dismiss these claims based on the Eleventh Amendment defense does not constitute a waiver. The lawsuit, as originally filed, consisted of federal claims of employment discrimination and SUNY did not dispute the court's jurisdiction over plaintiff's federal claims. Plaintiff first asserted her conversion and replevin claims on the eve of trial in 2000, almost ten years after she filed suit in this case. When these state claims were severed from the trial, there was no need to raise the Eleventh Amendment defense. (See Defs.' Reply Mem. at 3). At the same time, however, SUNY never expressly consented to the jurisdiction of this Court over these belatedly added state law claims of conversion and replevin, and its position on the state law claims has been consistent. See Lapides v. Bd. of Regents of the Univ. Sys., 535 U.S. at 622 (stating that the rules governing waiver by litigation conduct are motivated by "problems of inconsistency and unfairness"). Accordingly, the Court finds that SUNY never waived its Eleventh Amendment defense to these

---

[15] Citations to "Defs.' Reply Mem." refer to the Reply Memorandum of Law in Further Support of Defendant SUNY's Motion for Summary Judgment, dated September 15, 2006.

claims.

3) Judicial Estoppel

As a corollary to the waiver argument, plaintiff also appears to argue that the doctrine of judicial estoppel prevents SUNY from claiming Eleventh Amendment immunity.

The Second Circuit has explained that "judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding" in order to prevent the "perpetuation of untruths" that could undermine public faith in the judicial system, and to prevent inconsistent results in different proceedings. Bates v. Long Island R.R. Co., 997 F.2d 1028, 1037-38 (2d Cir.), cert. denied, 510 U.S. 992 (1993). Two elements are required for judicial estoppel to apply. First, the party must have asserted an inconsistent position in a prior proceeding, and second, that prior inconsistent position must have been adopted by the Court in some way. See id. at 1038.

Plaintiff asserts that SUNY took one position when it represented to the Court in January 2000 that SUNY had jurisdiction over the laboratory equipment and that SUNY was consenting to the jurisdiction of the Court, a position adopted by the district court when it issued its Order on January 14, 2000 ("Jan. 2000 Order"), stating:

> based upon defendants' representations that they will cooperate
> with Dr. Pemrick in taking an inventory of the property currently
> in storage in East Flatbush, and that they voluntarily will return to
> Dr. Pemrick the equipment that is determined to belong to her, the
> parties have agreed that there is no need to bring a formal motion
> to amend the complaint to add a claim for replevin or conversion,
> and no need to litigate the issues surrounding Dr. Pemrick's
> laboratory equipment. As a further result of these representations,
> the parties are ORDERED to conduct a joint physical inventory of
> the property in the warehouse . . .

(Jan. 2000 Order). Dr. Pemrick argues that this Order indicates that SUNY was representing its intention to give the equipment back to Dr. Pemrick, and that SUNY was submitting to the jurisdiction of the Court on this matter. (See Pl.'s Mem. at 24). She asserts that SUNY is thus judicially estopped from now taking the contrary position that this Court lacks jurisdiction to consider her claims. She contends that because there was an order issued to advance settlement on these state law claims, SUNY cannot now argue that the Court does not have jurisdiction over the state law claims based on Eleventh Amendment immunity. She argues that SUNY cannot claim that this Court does not have jurisdiction over the state law claims because SUNY once represented that SUNY had "jurisdiction" over the equipment. (See id. at 24-27).

However, the January 2000 Order does not indicate that SUNY represented that plaintiff was entitled to any of the equipment, but merely at that early stage of investigating these claims, SUNY represented that it would return any of "the equipment that is determined to belong to her." (Jan. 2000 Order at 1). The January 2000 Order goes on to note that the "Court is mindful of the rather complex ownership issues involved with this property and that defendants may have obligations to the institutions that provided the grant monies with which the equipment was purchased." (Id. at 2). The January 2000 Order then addresses other matters relevant to the upcoming trial on Dr. Pemrick's employment discrimination claims. (See id. at 2-3). Although the Order indicates that at that time, the parties had agreed that it was unnecessary for plaintiff to amend to add claims for conversion or replevin, there is nothing in the Order that suggests a concession by SUNY that Ms. Pemrick was the owner or otherwise entitled to the return of anything other than the laboratory equipment that "belong[ed]" to her. (See id. at 1).

Plaintiff asserts that once SUNY took the position that it had control over the equipment; now it claims that the Court does not have jurisdiction over these claims. (See Pl.'s Mem. at 27). However, the question of whether SUNY had control over the equipment is a different one from whether or not this Court has jurisdiction over SUNY regarding the state law claims that plaintiff has asserted relating to that equipment. Judicial estoppel thus has no bearing on the question of whether or not SUNY may argue that this Court does not have jurisdiction over the equipment although it once represented that SUNY had control over that equipment because the two assertions are not inconsistent.

Plaintiff's argument that SUNY may not claim immunity on the State law claims that have been asserted against it because of the January 2000 Order also fails. SUNY appears, from the language of the January 2000 Order, to have been engaging in settlement negotiations with plaintiff on the issue of equipment in connection with her employment discrimination lawsuit, while plaintiff contemplated adding state law claims for the equipment. The fact that a settlement was not reached prior to the filing of the state law claims does not prevent SUNY from subsequently disputing the plaintiff's claim of ownership and the jurisdiction of the Court. It was not until later that plaintiff added her state law claims for conversion and replevin, which were severed from the federal claims, and to which SUNY now asserts Eleventh Amendment immunity in this summary judgment motion. SUNY's decision to wait until after the January 2000 Order to assert Eleventh Amendment immunity does not evidence factual inconsistency, nor did the Order itself codify such a position.[16] The January 2000 Order recognized that the

_____

[16]Plaintiff has also briefly mentioned, in a supplemental letter dated February 13, 2007 ("Pl.'s Supp. Letter"), that the doctrine of equitable estoppel should apply to prevent SUNY from arguing these same two points. (See Pl.'s Supp. Letter). Application of the doctrine of "[e]quitable estoppel is proper where the enforcement rights of one party would create injustice

ownership of the equipment was as yet unsettled, and noted that the state law claims had not yet been filed on the matter.

Thus, because the January 2000 Order is not inconsistent with such a claim, the Court finds no impediment to SUNY's argument that it is immune from suit on these state law claims pursuant to the Eleventh Amendment. Accordingly, the Court concludes that it has no jurisdiction to consider plaintiff's claims because SUNY is immune from suit under the Eleventh Amendment on these state law claims, and the Court therefore grants summary judgment in favor of SUNY, dismissing plaintiff's claims against this defendant in their entirety.[17]

C) Research Foundation's Motion for Summary Judgment

_____

to the other party who has justifiably relied on the words or conduct of the party against whom estoppel is sought." OSRecovery, Inc. v. One Groupe Intern., Inc., 462 F.3d 87, 94 n.3 (2d Cir. 2006) (citing Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 148 (2d Cir. 2005)). Equitable estoppel, like judicial estoppel, is concerned with inconsistent factual representations. See Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001). No such inconsistent position has been taken by SUNY relevant to Eleventh Amendment immunity, and it is thus not barred by equitable estoppel from pursuing this defense. SUNY's claim that it had "jurisdiction" over the equipment is not inconsistent with the legal argument made here that the Court has no jurisdiction over plaintiff's state law claims. Nor does the January 2000 Order indicating that SUNY had been engaged in settlement negotiations with plaintiff at that time demonstrate a factual inconsistency with SUNY's present legal argument that the Court does not have jurisdiction over claims that had yet to be filed at the time of the January 2000 Order.

[17]Plaintiff has also argued that SUNY should not be permitted to claim immunity because it is "an integrated institution" with the Research Foundation based on the fact that the NIH award lists both SUNY and the Research Foundation as grantees. (Pl.'s Mem. at 19). She also notes that for the purposes of the federal employment discrimination claims, the district court determined that the two organizations were "joint, integrated employers for purposes of Title VII, and that both are properly deemed Pemrick's employer for the purposes of this action." Pemrick v. Stracher, 67 F. Supp. 2d 149, 164-65. Plaintiff has offered no authority to suggest that such a relationship between the two defendants would vitiate SUNY's claim of Eleventh Amendment immunity. It is undisputed that SUNY and the Research Foundation were inter-related. However, nothing suggests that this relationship somehow deprives SUNY of its status as a governmental entity that is immune from suit in federal court on state law claims.

Defendant Research Foundation moves for summary judgment on plaintiff's remaining state law claims for conversion and replevin, arguing that plaintiff never held title to the laboratory equipment purchased with Federal grant money, nor did she ever have a possessory right superior to that of the Research Foundation. (RF Mem.[18] at 1-2).

1. Standards for Summary Judgment

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. Coll. at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133–34 (E.D.N.Y. 1985) (stating that summary judgment "is a drastic remedy and should be applied sparingly"), the Court should not grant summary judgment unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Egelston v. State Univ. Coll. at Geneseo, 535 F.2d at 754 (internal citations omitted); see also Auletta v. Tully, 576 F. Supp. 191, 194-95 (N.D.N.Y. 1983), aff'd, 732 F.2d 142 (2d Cir. 1984) (stating that summary judgment should be granted only if "it is clear that the requirements of Fed. R. Civ. P. 56 have been satisfied"). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party

[18]Citations to "RF Mem." refer to the Memorandum of Law in Support of Research Foundation's Motion for Summary Judgment, submitted on June 12, 2006.

opposing the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Ford v. Reynolds, 316 F.3d at 354 (stating that "[i]n determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant") (citing Marvel Characters v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002)).

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858 (S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247–48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.


2. Conversion

In order to maintain a claim for conversion under New York law, there must be a showing that plaintiff had "legal ownership of a specific identifiable piece of property" and that the defendant "exercise[d] . . . domination over or interference with the property in defiance of plaintiff's rights." Ishay v. City of New York, No. 96 CV 5829, 2000 WL 1140347, at *7

(E.D.N.Y. Aug. 8, 2000) (quoting <u>Di Siena v. Di Siena</u>, 266 A.D. 2d 673, 674 (3d Dep't 1999));

<u>see also</u> <u>CSC Holdings, Inc. v. Westchester Terrace at Chrisfeld Condominium</u>, 235 F. Supp. 2d

243, 587-58 (S.D.N.Y. 2002); <u>Anglo-Iberia Underwriting Management Co. v. Lodderhose</u>, 224

F. Supp. 2d 679, 689 (S.D.N.Y. 2002); <u>United States v. Paladin</u>, 539 F. Supp. 100, 103

(W.D.N.Y. 1982).  Thus, as an initial step, plaintiff must establish that she had "legal ownership"

of the laboratory equipment purchased with the grant money.


a) <u>Ownership or Title to the Equipment</u>

Defendants contend that under the terms of the grant, title to the equipment purchased

with grant funds vested not in Dr. Pemrick but rather in the Research Foundation.  (Defs.' 56.1

Stmnt. ¶¶ 10, 11; RF Mem. at 3-4).  The Research Foundation argues that Dr. Pemrick had

neither an ownership interest nor a possessory interest in the property, and that accordingly, she

cannot establish the elements necessary to assert a cause of action for conversion.  (<u>See</u> RF

Mem. at 1-2, 8-9).

According to the Notice of Grant Award ("Award") dated 1987,[19] SUNY and the

Research Foundation are listed as the "Grantee Institution," while Dr. Pemrick is listed as

"Principal Investigator/Program Director/Awardee."  (<u>See</u> Aff. ¶ 11, Ex. 9).  The Notice of Grant

provides as part of its terms of acceptance that:

> By acceptance of funds awarded under this grant, the grantee
> acknowledges that it will comply with the terms and conditions in
> the following: (1) Legislation cited above; (2) Regulations cited
> above; (3) Provisions on or attached to this award notice and
> signed by the official(s) named below; (4) PHS Grants

---

[19]Plaintiff has also submitted a second Notice of Grant Award dated 1978, containing identical language in the relevant sections.  (<u>See</u> Pl.'s Mem., Ex. 23).

> Administration Manual Chapters in effect on the beginning date of
> the grant Budget Period; (5) PHS Grant Policy Statement in effect
> on the beginning date of the grant Budget Period; (6) 45 CFR [sic]
> Part 74. The above order of precedence shall prevail.

(Aff. ¶ 11, Ex. 9). Thus, in determining whether the Research Foundation or Dr. Pemrick held

title to the equipment, the Court turns to these sources for guidance.

The Award ultimately directs the Court to look to the terms of the Code of Federal

Regulations "Part 74." (See Award). The relevant C.F.R. provision states that "[t]itle to

equipment acquired by a recipient with HHS funds shall vest in the recipient. . . ." 45 C.F.R. §

74.34(a). The C.F.R. further identifies the grant "recipient" as "an organization receiving

financial assistance directly from an HHS awarding agency to carry out a project or program. . . .

includ[ing] public and private institutions of higher education . . . ." (Id. (citing 45 C.F.R. §

74.2)). Nowhere does the definition encompass individual researchers. See 45 C.F.R. § 74.2.

The Court nonetheless turns to the remaining provisions of the Award to ascertain which party is

the "recipient," and thus the holder of title to equipment acquired via the grant.

The Award first cites to the "[l]egislation cited above," and "[r]egulation[] cited above."

This refers to the statutory provision of 42 U.S.C. § 241, and the corresponding section of the

Code of the Federal Regulations, 42 C.F.R. § 52. (See id.) Section 241 does not provide any

guidance on whether the grantee institution or the principal investigator holds title to equipment

grants. See 42 U.S.C. § 241. However, Section 52 of the Code of Federal Regulations provides

definitions that are useful in this determination. See 42 C.F.R. § 52.2. Specifically, Section 52.2

defines "grantee" as "the institution, organization, individual or other person designated in the

grant award document as the responsible legal entity to whom a grant is awarded under this part.

. .[;] [p]rincipal investigator means a single individual designated by the grantee in the grant

application and approved by the Secretary, who is responsible for the scientific and technical direction of the project." Id. The federal regulations thus indicate that SUNY and the Research Foundation, because they are listed as the "grantee," are the "responsible legal entity to whom a grant is awarded," while Dr. Pemrick was not a responsible legal entity to whom the grant was awarded, but was rather the Principal Investigator who was "responsible for the scientific and technical direction of the project." Id.; (See also Aff. ¶ 11, Ex. 9). Thus, under the federal regulations, the Research Foundation, not plaintiff, was the "grantee." Although not conclusive, this regulation suggests that the Research Foundation held title to the equipment under 45 C.F.R. § 74.34(a).

The Award next refers to "(3) Provisions on or attached to this award notice and signed by the official(s) named below. . . ."[20] (Aff. ¶ 11, Ex. 9). The only relevant provision of the Award is consistent with the C.F.R. provisions in that the award lists the Research Foundation as the "Grantee Institution" and Dr. Pemrick as "Principal Investigator/Program Director/Awardee." (Aff. ¶ 11, Ex. 9). No additional provisions have been provided to the Court, and presumably there are none.

As part of the terms of acceptance, the Award next refers to "(4) PHS[21] Grants Administration Manual Chapters in effect on the beginning date of the grant Budget Period." (Aff. ¶ 11, Ex. 9). The Research Foundation provided the relevant PHS Grants Administration Manual Chapter ("Manual") glossary as Exhibit 6 to their Joint Affirmation. (See Aff. ¶ 8, Ex. 6). Under the PHS Glossary of Terms, "grantee" is defined as "[t]he organizational entity or

---

[20]By the terms of the Award, the federal regulations are given greater precedence than other source documents, but the other sources listed in the Award provide further guidance.

[21]Citations to "PHS" refer to Public Health Service.

individual to which a grant . . . is awarded and which is responsible and accountable both for the use of the funds provided and for the performance of the grant-supported project or activities." Id.  The glossary goes on to define "Recipient" as "[t]he grantee or, where subgrants are authorized by law, the subgrantee that receives PHS financial assistance in the form of grants or cooperative agreements."  Id.  The Research Foundation is unambiguously listed as the grantee on the Award, and no evidence of any subgrantee grants or cooperative agreements have been provided to the Court.  Thus, by the terms of the Manual, the Research Foundation is both the grantee and the recipient of the grant.

The Award next points to the PHS Grant Policy Statement in effect on the beginning date of the grant Budget Period.   No such policy statement has been provided to the Court, or even referred to by the parties.  Accordingly, the Court does not consider it in the analysis here.

Under all of the regulations and guidelines that governed the parties' acceptance of this award, and by the unambiguous terms of the Award itself, the Research Foundation is both the "recipient" and the "grantee" of Dr. Pemrick's grant, while plaintiff, as the "Principal Investigator/Program Director/Awardee," was responsible for the direction of the research. Consistent with the other sources, this indicates that it was the Research Foundation which had legal title to the resources provided by the grant, not Dr. Pemrick.

Further supporting this analysis is the Research Foundation's Project Director's Handbook ("Handbook"),[22] which also states that title to equipment purchased with grant funds

---

[22]Plaintiff admitted in her deposition that she was aware of the Handbook.  (Id. ¶ 11 (citing Pemrick Dep. at 43)).  However, plaintiff disputes the applicability of the 1988 Project Director's Handbook in her Reply Memorandum of Law, speculating without support, that "[i]t is likely defendants revised their policies moment by moment as they dispensed with plaintiff, because it is an undisputed fact, that plaintiff's case is unique."  (Pl.'s Reply Mem. at 4). Specifically, she points to three sentences which were removed from the 1986 Handbook, which

"normally vests in the Research Foundation unless sponsor retains title."  (Defs.' 56.1 Stmnt. ¶ 11; Aff. ¶ 7, Ex. 5).  The "sponsor" is identified as either "Federal or private," and appears to indicate the funder - - in this case NIH.  <u>See</u> <u>id.</u>  In no way could the term "sponsor" be interpreted to encompass Dr. Pemrick, as Principal Investigator.  <u>See</u> <u>id.</u>

Thus, since the "recipient" of the grant was the Research Foundation and title to equipment purchased with grant funds "vest[s] in the recipient," it is clear that title to the equipment purchased with grant funds lies with the Research Foundation.  <u>See</u> 45 C.F.R. § 74.34(a).  Moreover, under the grant, the Research Foundation was authorized to use the grant funds to purchase certain laboratory equipment and materials for use in connection with plaintiff's ongoing research projects.  (Defs.' 56.1 Stmnt. ¶¶ 6, 7).  Payment for the purchase of equipment was through a letter of credit issued to the Research Foundation, not to Dr. Pemrick. <u>Id.</u>  If the project had terminated before the total amount of the grant was expended, the remaining balance was to be returned to the NIH; it was not to be retained by the principal investigator or by the institutional recipient.  (<u>Id.</u>)

Under the procedures set forth in the Handbook, when there is a transfer of equipment from the Research Foundation to another institution, title is either transferred to the new institution or remains with the sponsor agency.  (<u>Id.</u> ¶ 19).  Title is not transferred to the researcher.  (<u>Id.</u>)  By letters dated March 30, 1987, November 15, 1989 and April 16, 1990, plaintiff was reminded that the equipment and materials purchased with grant funds could be transferred in accordance with the "terms and conditions of the grant awards."  (<u>Id.</u> ¶ 20).  Since plaintiff never informed the Research Foundation that she had secured an appointment at another

---

she contends all pertain to equipment.

institution where she would be in a position to use the equipment,[23] the Research Foundation was required to inventory and retain the equipment for other researchers. (Id. ¶ 21). Under 45 C.F.R. § 74.34(c), the "recipient shall use the equipment in the project or program for which it was acquired as long as needed, whether or not the project or program continues to be supported by Federal funds. . . ." 45 C.F.R. § 74.34(c). Section 74.34(d) further provides that the recipient "shall make [the equipment] available for use on other projects or programs" so long as its use does not interfere with the program or project under which the equipment was acquired. 45 C.F.R. § 74.34(d). The Research Foundation's Property Control Office maintains an inventory of available equipment that must be considered before additional equipment may be purchased with sponsored funds. (Defs.' 56.1 Stmnt. ¶ 21).

Thus, it appears undisputed that according to the terms of the Award and the applicable federal regulations, the Research Foundation, and not Dr. Pemrick, continued to hold title to the equipment. Moreover, as the Research Foundation points out, even if the equipment had been transferred to another institution, and title was no longer vested in the Research Foundation, title would never be acquired by plaintiff, but would either be transferred to the new institution, or remain with the grant sponsor, NIH. (Id. at ¶ 19). Although plaintiff argues that she is the owner of the equipment because it was purchased with funds from a grant for which she was the Principal Investigator, she offers no legal authority to support her claim of title.

She asserts that, contrary to defendants' argument, she always thought the laboratory equipment belonged to her, referring to it as "'my dismantled laboratory,'" and "'my most expensive research equipment and specialized glassware.'" (Pl.'s Mem. at 13). Similarly, she

---

[23]Apparently, plaintiff obtained other positions that did not require her to use the equipment. (Id. ¶ 20 (citing Pemrick Dep. at 85)).

claims that the SUNY administrators also referred to it as "'her laboratory'" and "'your laboratory equipment.'" (Id.) This alone, even if accepted as true for purposes of the motion, is not a sufficient basis on which to find ownership in the face of the clear language of the Award and the relevant regulating provisions.

b) Bailment

As an alternative argument, plaintiff contends that Dr. Scherl, president of SUNY Brooklyn, in his March 31, 1987 letter to plaintiff, committed to hold the equipment until plaintiff transferred to a new institution, and that by doing so, he assumed responsibility as a "bailee" "for the safekeeping and return of the property to the bailor, plaintiff." (Pl.'s Mem. at 9). Citing several state cases, plaintiff argues that the issue of title to the equipment is moot: "'Title [is] not the sina qua non for bringing action to recover a chattel[;] instead plaintiff need only have a right to possession of chattel superior to that of defendant.'" Id. (quoting Benhum v. Butler, 255 A.D.2d 664, 655; 679 N.Y.S. 2d 460, 462-63 (3d Dep't 1998) and citing cases). Plaintiff contends that in Dr. Scherl's letter, he admitted plaintiff's superior right of possession and, as a consequence, is now estopped from asserting title either in the name of SUNY or the Research Foundation. (Id.)

Plaintiff has failed to cite any authority to support her argument that merely by agreeing to hold the equipment until plaintiff transferred to another institution - - an obligation required by the C.F.R. - - Dr. Scherl agreed to become a bailee. (See id.) Under New York law, the "elements of a bailment are 'intent to create the bailment, delivery of possession of the bailed items, and acceptance of the items by the bailee.'" A I Marine Adjusters, Inc. v. M/V SIRI

BHUM, No. 05 CV 7227, 2007 WL 760415, at *4 (S.D.N.Y. Feb. 8, 2007) (quoting Kingdom 5-KR-41, Ltd. v. Star Cruises PLC, Nos. 01 CV 2946 & 01 CV 7670, 2004 WL 359138, at *5 (S.D.N.Y. Feb. 26, 2004)). In this case, Dr. Pemrick never delivered the items to the Research Foundation, nor is there any evidence that they were accepted by the Research Foundation from Dr. Pemrick with the intent to create a bailment. Title to the equipment rested throughout with the Research Foundation, and the property was always in the possession of defendants. Moreover, contrary to plaintiff's unsupported assertions, Dr. Scherl's letter does not purport to convey title, nor did he have the authority to convey title to the equipment where by law, title vested in the Research Foundation to be transferred only to the NIH or another grantee institution.[24] (See Aff., Ex. 15). Plaintiff has failed to establish that Dr. Scherl had either the intent or the authority to transfer title of the equipment, nor has she established the elements necessary to find that the Research Foundation became a bailee for the equipment.

  c) Promissory Estoppel

  Dr. Pemrick mentions in passing, again without authority, that the letter from Dr. Scherl

---

[24]Plaintiff also argues that defendants improperly maintained the equipment during the time that Dr. Scherl had told plaintiff that it would be preserved pending her transfer to another institution. (See Pl.'s Mem. at 17-21; Pl.'s Reply Mem. at 18). She asserts that the equipment should have been kept until at least April 16, 1990, based upon the letter from Dr. Schwarz to plaintiff indicating that her grant manager had informed him that her proposal was no longer being considered. (See id.) This letter does not demonstrate that her grant application was in fact still being considered until this date, but merely that at some unspecified point before the date of the letter, the grant office had stopped considering her application. (See Aff., Ex. 19). Regardless of when her grant application was formally rejected, or whether or not the Research Foundation was properly cataloging and maintaining the equipment during this time, defendants have demonstrated that Dr. Pemrick never held title the equipment, and never could hold title to the equipment. Plaintiff cannot maintain a claim for conversion or replevin against a defendant for property to which that defendant held a superior property right.

is sufficient to establish her right to the equipment via promissory estoppel.  (See Pl.'s Supp. Ltr).

In order to establish a claim of promissory estoppel under New York law, plaintiff is required to establish "'(1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) an injury sustained in reliance on the promise'" Gurreri v. Associates Ins. Co., 248 A.D.2d 356, 357, 669 N.Y.S.2d 629, 631 (2d Dep't 1998) (quoting Rogers v. Town of Islip, 230 A.D.2d 727, 646 N.Y.S.2d 158 (2d Dep't 1996)), see also Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A., No. 03 CV 1537, 2003 WL 23018888, at *6 (S.D.N.Y. Dec. 22, 2003), aff'd, 110 Fed. Appx. 191 (2d Cir. 2004) (quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 78 (2d Cir. 1984)).

A review of the correspondence between plaintiff and a number of SUNY and Research Foundation staff members regarding the equipment demonstrates that in none of the letters was a clear and unambiguous promise made to give Dr. Pemrick title to the equipment.  (See Aff., Exs. 13, 17, 18, 19, 20).  At best, the language cited in Dr. Scherl's letter indicates that defendants would maintain the equipment before ultimately transferring title to a new institution.  (See Aff., Ex. 13).  Since Dr. Pemrick never requested that the equipment be transferred to another institution, she cannot claim that she sustained any injury on the basis of this promise.  Thus, the Court concludes that plaintiff has failed to establish, or even allege, facts necessary to sustain the essential elements of promissory estoppel.

Accordingly, because plaintiff has failed to set forth material issues of fact in dispute as to her claim of ownership in the equipment at issue, the Court grants summary judgment in favor

of defendant Research Foundation on the conversion claim.[25]

2. Replevin

Plaintiff also brings a claim for replevin under New York law. As with conversion, replevin requires a showing that the plaintiff has a possessory right to the property which is superior to that of the defendant. See G&S Quality Inc. v. Bank of China, 233 A.D.2d 215, 216, 650 N.Y.S.2d 97, 98 (1st Dep't 1996), overruled on other grounds, Jamie v. Jamie, 19 A.D.3d 330, 798 N.Y.S.2d 36 (1st Dep't 2005); see also Honeywell Information Systems, Inc. v. Demographic Systems, Inc., 396 F. Supp. 273, 275 (S.D.N.Y. 1975); Bindheim v. Butler, 255 A.D.2d 664, 665, 679 N.Y.S. 2d 460, 462-63 (3d Dep't 1998).

Again, plaintiff's possessory claim to the equipment is based on the fact that the equipment was intended for plaintiff's research project. However, plaintiff has provided no authority to counter defendants' argument that once her project grant terminated and she failed to request a transfer of the equipment to a new institution, NIH policy and the Research Foundation's guidelines provided that the Research Foundation, as the grantee/recipient, would maintain and use the equipment. Just as the plaintiff was not permitted to keep unused grant monies for herself, the equipment purchased with those funds was not hers to dispose of. Plaintiff has failed to demonstrate that there is any genuine issue of material fact in dispute as to who had the superior right to this property. The Research Foundation unquestionably held a

---

[25]Even if plaintiff could assert a superior possessory right in the property, she concedes that she has never demanded return of the property, which is a prerequisite to recovery under New York law. See Lake v. R. Homes Corp., 304 A.D.2d 533, 757 N.Y.S.2d 467 (2d Dep't 2003); D'Amico v. First Union Nat'l. Bank, 285 A.D.2d 166, 172, 728 N.Y.S.2d 146, 151 (1st Dep't 2001) (holding that "it is well settled that, where the original possession is lawful, a conversion does not occur until after a demand and refusal to return the property"), leave to appeal denied, 99 N.Y.2d 501, 752 N.Y.S.2d 588 (2002).

superior right to the equipment.  See discussion supra at 21-30.

Accordingly, in the absence of any authority to support plaintiff's claim of a superior possessory right in the equipment, the Court grants summary judgment in favor of the Research Foundation on plaintiff's claim for replevin.[26]


## CONCLUSION

Accordingly, for the reasons set forth above, the Court grants summary judgment in favor of defendants, dismissing plaintiff's remaining claims in their entirety.


**SO ORDERED.**

Dated: Brooklyn, New York
          June 28, 2007


                                              _____
                                              Cheryl L. Pollak

---

[26]Plaintiff contends that the parties dispute whether in 1989-90, defendants failed to safeguard plaintiff's property and, as a consequence, whether plaintiff's career was damaged. (Pl.'s Mem. at 17).  Even if plaintiff could establish possessory rights in the equipment superior to that of the Research Foundation, there is no basis in law for plaintiff's claim for consequential damages to her career in this action under theories of conversion and replevin, particularly when the equipment at issue had a market value at the time that could easily be determined.  See, e.g., Fantis Foods, Inc. v. Standard Importing Co., Inc., 49 N.Y.2d 317, 326, 402 N.E.2d 122, 125 (1980) (noting that "[t]he usual measure of damages for conversion is the value of the property at the time and place of conversion, plus interest," while profits lost are "generally disallowed"); Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C., 435 N.Y.S.2d 438 (N.Y. Sup. Ct. 1980) (noting that the "function of an award of damages in an action for conversion is to indemnify the injured party by awarding him the value of the converted property. Where the nature of the goods involved is such that they are readily exchanged in the market place, the measure of damages is the fair market value of the goods at the time of conversion . . . which is generally the price at which the goods can be replaced in the market"), aff'd, 441 N.Y.S.2d 408 (2d Dep't 1981); Scutti Pontiac, Inc. v. Rund, 92 Misc.2d 881, 887, 402 N.Y.S.2d 144, 149 (N.Y. Sup. Ct. 1978) (noting that replevin is an action to determine a right to possession to chattel, and that relief is obtained through seizure of that chattel or a restraining order as to the chattel).

United States Magistrate Judge